JAMES ET AL. vs. THE BANK OF THE STATE OF ALABAMA.

1. A court of chancery will not specifically enforce a contract or agreement founded in mutual mistake, when it would materially affect the rights of the defendant.
2. Equity looks rather to the spirit and intention of the parties than to the words in which a contract or agreement is expressed, and will give such construction to it as is consistent with that intent and the equity of the case.

Error to the Chancery Court of Tuscaloosa. Tried before the Hon. W. W. Mason.

PECK, for the plaintiffs in error:

1. The agreement was made upon good consideration and was obligatory on the bank. The agreement of Boykin after his discharge, and his compliance with it by the payment of one third of the sum due on the bill, *and the curtailment on his note after his discharge as a bankrupt*, was a good consideration.

2. The plaintiffs, being mere accommodation drawers and endorsers, are entitled to the benefit of this agreement and to have it enforced. This can only be done in chancery, because the plaintiffs, not being parties to the agreement, can have no remedy at law.—1 Story's Eq. 478, § 499; Cullum v. Emanuel & Gaines, 1 Ala. 26.

3. Courts of equity constantly decline to lay down any rule which shall limit their power and discretion as to the particular cases in which injunctions shall be granted.—2 Story's Eq. 226, § 959, A. As to the jurisdiction of chancery to decree the specific execution of contracts of a personal nature—see 2 Story's Eq. p. 26, § 718, *et seq.* A court of equity, if a contract is broken, will often compel the party specifically to perform the contract, when courts of law can only give damages for the breach of it.—1 Story's Eq. § 30, p. 29. They will also decree the specific execution of a contract in favor of sureties.—2 Story's Eq. 37, § 730. Also, when a valid agreement is made by the creditor to give time to the principal debtor, without the consent of the security, the latter will be held discharged, even if the surety is not injured by the contract.—2

Story's Eq. 171, § 883.: And a perpetual injunction will be granted restraining the creditor from proceeding at law to collect the debt of the surety. The occasions on which an injunction may be used to stay proceedings at law, are almost infinite in their nature and circumstances.—Ib. § 885., p. 172.

J. L. MARTIN, for defendant.

CHILTON, J.—This was a bill filed on the 11th May 1847, by Lorenzo and Robert D. James, to enjoin a judgment recovered against them in some court, the proceedings do not show in what, in favor of the defendant in error, for the sum of sixteen hundred and eighty-five dollars and costs of suit, upon which judgment an execution was then in the hands of the sheriff of Clarke county, for the sum of eight hundred and eighty-four, 20-100 dollars and interest, being the balance due thereon after allowing certain credits, &c. The bill avers that this judgment was rendered on a bill of exchange drawn by the complainant, Robert D. James, and payable to and endorsed by Lorenzo James, and that Burwell Boykin was the drawee and acceptor of the same, being for $1684, and due the 1st Jan. 1842. The ground upon which the injunction is prayed, is that before the rendition of the judgment Boykin was discharged as a bankrupt: That no proceedings had been instituted against him, but that some time after the rendition of the judgment against the complainants, Boykin proposed to the bank to pay of the debt then due from James on the bill the sum of $500—and the bank thereupon agreed to withdraw the bill from suit and to reinstate it as a debt due to said corporation: That said sum of $500 was duly paid: That subsequently to this, Boykin failing to make payment of the curtailments required by the bank, a negotiation was renewed, by which he proposed to the bank to pay one third of the balance of the debt that might be due, which proposition was accepted by the bank, as evidenced by a letter of Wm. Hawn, the cashier, in which he states, "Your communication of ———— was to-day laid before the board of directors, who have instructed me to say that upon your depositing one third of Mr. James' bill and the regular curtailments upon your note to our credit in the bank of Mobile, they shall be withdrawn from suit." This

amount the bill avers was accordingly deposited, making the whole sum paid $981 : That an execution, which had issued on the judgment, was returned by the sheriff by the authority and direction of the bank, endorsed " settled by plaintiff, as per order, dated 21st Jan. 1843 :" That no other execution issued until 1846, for more than three years after the rendition of the judgment: That Lorenzo James was never notified of the protest of the bill, and that the recitals in the judgment entry fail to show such notice, but the conduct of the bank has taken complainants by surprise, and in consequence of the delay, their writ of error to reverse the judgment is barred: That complainants were parties to the bill for the accommodation of Boykin, whose object and interest in making the arrangement above spoken of, was to procure the cancellation of the proceedings had against them, so that the debt should stand where it was before the judgment was rendered.

The bank in its answer denies the want of notice of protest to Lorenzo James, and insists that no arrangement was made to cancel the judgment, for in that event a new bill would have been required. The answer further insists, that the recitals in the judgment entry are full to the point of notice, &c.—and denies that the return of the sheriff was authorised by the bank: Admits that Boykin paid on the judgment $500, on the 29th. Dec. 1842, and the further sum of $481 on the first of Feb. '44,. which sums are credited on the judgment.

The proof made by Mr. Boykin shows these payments to have been made at the times and for the amounts as stated in the answer of the bank. By a letter from the cashier of the bank, under date the 7th Dec. '43, it appears that the bank, in answer to the proposition of Mr. Boykin, instructed the cashier to say, "upon depositing one third of Mr. James' bill (which was $481) and the regular curtailment on your note (amounting to $281 13) to our credit in the bank of Mobile, they shall be withdrawn from suit." These sums ($762 13) were paid by Mr. Boykin, on the 1st Feb. '44, as per letter of the cashier to him acknowledging the receipt of the certificate of deposit of that date, in which letter the cashier says: " The bill, I am informed this morning, for the first time, is in judgment, and it is not unlikely that the sheriff of your county has an execution now in his hands. In that event, you will pay him such costs

as he may be entitled to, if any, and ask him to return it, as per order of the bank, upon the authority of this letter." Since that time there has been no payment made, nor any further negotiation had respecting the demand.

An injunction having been granted upon the final trial, the chancellor dissolved the injunction and dismissed the bill, to reverse which decree, the complainants have removed the cause to this court.

We think it is very apparent, from the bare statement of this case, that the plaintiffs are not entitled to relief. It is not the case of securities seeking to be discharged, because by a valid agreement between their principal and the creditor the contract has been varied or changed and time given for the payment to the principal. But the bill proceeds upon another ground, viz: that the principal has made an arrangement with the creditor beneficial to the securities, to the specific execution of which they should be entitled: That it was agreed "the suit against them should be withdrawn," which agreement not having been observed by the bank, they pray the execution may be enjoined and the judgment set aside.

Now if there were no other ground for denying the relief prayed, it is quite sufficient that the parties at the time the arrangement was made to withdraw the bill from suit, were under a mutual mistake as to the condition in which the bill then was. It is manifest from the whole proceeding that they supposed the bill was in suit and could be withdrawn, and the litigation abandoned; whereas the bill as against these plaintiffs had been merged in the judgment which before the arrangement had been rendered against them. The judgment, and not the obligation to pay imposed by the bill, was the demand the bank had against the plaintiffs, and if the bank intended to cancel the judgment, then the effect of the arrangement would have been to discharge these plaintiffs from all liability. But such was not the design, and as this mistake would materially affect the rights of the bank, a court of chancery should not specifically execute a contract or arrangement founded upon it. On the other hand, had the parties, under a mistake of the fact that a judgment had been obtained on the bill, made an arrangement, the effect of which, against their intention, operated a discharge of the judgment, I apprehend a court of chancery would rectify the mis-

take, at least where no injury would result to the opposite side, the court being able to place them in *statu quo.* So, also, the defendant may urge it as a ground of defence or to rebut an equity.—2 J. C. Rep. 585 ; 2 Cow. Rep. 129. But there is another view of the case more conclusive against the plaintiffs. What was the object and intent of the arrangement made between the bank and Boykin ? We have seen it was not to release the plaintiffs. Had such been the object, the parties would doubtless have contracted directly for their discharge, and would not have left it to be implied as a doubtful consequence from the application of the rules of law to the agreement. The intention and substance of the arrangement is easily arrived at. Boykin, though he was discharged in bankruptcy, nevertheless determined to pay this as well as his other debts, where he was primarily liable. To effect this laudable purpose required time. Supposing this bill with a note which the bank held against him was in suit and would shortly be in judgment, he agreed with the bank to pay a curtailment on the note and one third of the bill, in consequence of which the note and bill should be withdrawn from litigation and remain in bank subject to such extensions as the bank might choose afterwards to make. It turns out the bank had a judgment on the bill, rendered near eighteen months before the arrangement was made, so that the bank, as against the plaintiffs, could not " withdraw the bill from suit," but it could grant the same indulgence on the judgment that would otherwise have been granted on the bill. This indulgence has been granted ; for no execution was issued from that time until Sept. '46, a period of more than two years and a half, and in the meantime, no payment has been made, nor is there any offer now to pay any portion of the balance due. The bank has certainly waited a reasonable time, and no specific time was agreed upon. The spirit and intention of the arrangement has been carried out by the bank, and to this a court of equity looks rather than to the form in which the agreement may be worded, and will give to the acts of the parties that construction which is consistent with the intent and with equity.— 2 Sumner's Rep. 487.

There is no reason shown for going behind the judgment— no equitable defence set up as a reason for opening it. If, as to one of the plaintiffs, there was a failure to notify him of the

6

dishonor of the bill, he should have pleaded it at law. There is no principle better settled than that this failure to do so without sufficient excuse deprives him of the right to resort to the court of equity for relief. But this defence is denied by the answer, and is not affirmatively shown by proof. There are other grounds of objection to the relief sought, urged by the counsel for defendant, such as the uncertainty of the arrangement, or agreement set up, the failure to comply with it on the part of the principal debtor, and the fact that the bill proposes to deprive the defendant of a legal advantage not fraudulently obtained, and is unaccompanied by any proposal to pay the amount justly due; but those we have noticed are sufficient to show that the decree of the chancellor was correct. Let it be affirmed.